IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LYDIA CURTIN-WILDING,<br>individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRUSTEES OF BOSTON UNIVERSITY<br><br>Defendant. | Case No. 1:25-cv-10432-WGY |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

Between February 2022 and August 2023, Defendant's practice was to pay Plaintiff and its other exempt employees their wages on the last business day of the month, instead of weekly or bi-weekly, as required under the Massachusetts Wage Act, G. L. ch. 149, § 148.[1] As a result of Defendant withholding their wages until the end of the month, Plaintiff and other putative class members suffered lost wages. *Reuter v. City of Methuen,* 489 Mass. 465, 471 (2022) ("'lost wages' encompass all late payments"). Contrary to Defendant's assertion that its violation is merely technical, it is in fact substantive and significant. As the Massachusetts Supreme Court emphasized in *Reuter v. City of Methuen,* the Wage Act was designed "for the protection of employees who are often dependent for their daily support upon the prompt payment of their wages." *Id.* at 468.

---

[1] As of August 2023, likely upon realizing the illegality of its pay practices, Defendant began paying Plaintiff and other exempt employees on a semi-monthly basis. Declaration of Julian Hammond, ¶¶ 2-3 and Ex. 1.

Delayed paychecks, the Court noted "could lead to missed mortgage payments…missed tuition payments…or, . . . inability to pay for crucial medication." *Id.* at 478 (Concurring Op.).

Also without merit is Defendant's position that Plaintiff seeks exorbitant penalties. Plaintiff seeks only what the statute mandates: "treble damages, as liquidated damages" as provided for under G.L. ch. 149, § 150. For example, Plaintiff earned approximately $4,500 per month, and statutory treble damages for the 18-month violation period amount to approximately $120,000 – no more, and no less than the law requires.

Defendant does not argue that it paid wages on time, weekly or bi-weekly. Instead, Defendant moves to dismiss Plaintiff's claim arguing that it is preempted by § 301 of the Labor Management Relations Act ("LMRA") because the terms and conditions of Plaintiff's employment were set by a collective-bargaining agreement ("CBA"). Recognizing that this suit does *not* allege a violation of that CBA, *see* ECF No. 24 ("Mot.") at 4, the University argues that Plaintiff's claim is nonetheless preempted because resolution of that claim will require interpretation of the CBA; more precisely, whether Plaintiff and Class Members elected to be paid monthly. It plainly will not: the University can point to no provision of the CBA that *could* be interpreted to answer whether Class Members elected to be paid monthly, nor any other question pertinent to Plaintiff's wage claim. Defendant is also wrong to argue that, even if wages were paid late, Plaintiff was required to pursue her claim via the CBA's grievance and arbitration procedure. As discussed above, Plaintiff's claim is one based on state law and is not a "grievance" as it does not concern "interpretation, application, or … violation of a specific term or provision" of the CBA. *See* CBA at 8).

Besides the fact that there is no provision of the CBA that requires interpretation to resolve Plaintiff's claim and that Plaintiff's claim is not subject to the grievance procedure, the terms of

2

Plaintiff's employment during the relevant period (February 2022 and August 2023) *were not* subject to the CBA. In fact, Plaintiff was expressly excluded from the coverage of the CBA. For all these reasons, the University's motion should be denied.

## BACKGROUND FACTS, PLAINTIFF'S CLAIM, AND THE CBA

### A. Plaintiff's Employment at Boston University and Plaintiff's Claim

Plaintiff has been employed by the University as a lecturer since August 2015 and as a Director of the Metropolitan College Health Communication program from August 2015 through to July 30, 2023.  Compl. ¶ 13; Declaration of Lydia Curtin-Wilding ("Curtin-Wilding Decl.") at ¶¶ 2-3.  The Health Communication program in which Plaintiff Curtin-Wilding teaches and was the director of during the Class Period is a program that is offered fully online.  Curting-Wilding Decl., ¶ 4.

Throughout the Class Period (February 18, 2022 through to August 1, 2023), like other putative Class Members, Plaintiff was paid by the University monthly on the last business day of the month. Compl. ¶¶ 13, 15.  Plaintiff and the Class never elected to be paid on a monthly basis. *Id.* ¶ 16.  Accordingly, Plaintiff alleges that the University's practice of paying Class Members at the end of the month resulted in wages earned in the first half of each month being paid late, in violation of G. L. ch. 149, § 148, and the withholding of millions of dollars in wages, causing harm to members of the Class.  *Id.* ¶¶ 6, 8–9.

### B. Collective Bargaining Agreement

The University contends that the terms of Plaintiff's employment were determined by a CBA between the University and the Service Employees International Union, Local 509, and therefore that her claim "turns on rights and obligations contained" in the CBA.  ECF No. 24 ("Mot.") at 1.  The CBA does not cover all individuals employees at BU; it is the "sole and

exclusive bargaining representative for all non-tenured or non-tenure track lecturers, senior lecturers, master lecturers and instructors who are salaries…, and who teach at least one credit-bearing course on the Charles River Campus of Boston University, …but *excluding* all professor…; director of the Health Communication Program; …all faculty who teach exclusively in on-line programs;…" CBA, sec. 1 (emphasis added).

Of relevance to its preemption argument, the University relies on two provisions of the CBA found at Article 21, which (despite its failure to *actually* designate when employees would be paid) is entitled "Payday":

> Section 1. Salaried Lecturers . . . shall be paid on a timely basis, in accordance with the University's normal business operations, for the teaching and other compensable duties performed . . . .
>
> Section 2. Salaried Lecturers . . . shall receive an itemized pay stub, in paper or electronic form at the Universities discretion. The precise payday shall be the same day set for others in the University who are similarly situated.

Mot. Ex. A, ECF No. 24-1 ("CBA") at p. 23. The University argues that these two provisions require interpretation and thereby mandate LMRA preemption.

The University alternatively argues that Plaintiff is precluded from bringing a claim under § 301 because she has not exhausted a grievance and arbitration provision found at Article 7 of the CBA:

> Section 1. A grievance within the meaning of this Agreement shall be any dispute concerning the interpretation, application, or claimed violation of a specific term or provision of this Agreement. This is the sole and exclusive procedure for the resolution of Salaried Lecturer or Instructor grievances under this Agreement.

CBA at p. 8.

///
///
///

**ARGUMENT**

    **I.    Applicable Legal Standards**

Section 301 of the LMRA provides federal court jurisdiction over controversies involving collective-bargaining agreements, and "also 'authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements.'" *Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 403 (1988) (*quoting Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451 (1957)). *See* 29 U.S.C. § 185(a). In the interest of promoting a "smooth resolution of labor-management disputes" and to ensure "uniformity in labor law across jurisdictions," section 301 preempts state-law claims if resolution of the dispute requires the <u>interpretation</u> of a CBA. *Austin v. Ken's Foods, Inc.*, No. 4:24-CV-40040-MRG, --- F.Supp.3d ---, 2025 WL 889438, at *3 (D. Mass. Mar. 21, 2025) (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210–11 (1985); *Lingle*, 486 U.S. at 405–6). However, despite Congress' intent to establish uniformity in resolving labor law disputes across jurisdictions, "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law." *Allis-Chalmers*, 471 U.S. at 211–12. Nor is it true that Congress, "in adopting § 301, wished to give the substantive provisions of private agreements the force of federal law, ousting any inconsistent state regulation." *Id.* In other words, Congress didn't intend § 301 to extinguish state-law rights based merely on the fact that parties to a dispute have between them a CBA. Rather, section 301 only preempts state-law claims that are "'*substantially* dependent upon analysis of the terms of an agreement made between the parties in a labor contract,' where such claims are 'inextricably intertwined with consideration of the terms of the [CBA],' and [where] more than 'mere consultation' of the CBA is required to resolve the state-law claims.'" *Austin*, 2025 WL 889438, at *3 (quoting *Allis-Chalmers*, 471 U.S. at 220) (citing *Cavallaro v.*

*UMass Mem'l Healthcare, Inc.*, 678 F.3d 1, 7 (1st Cir. 2012); *Adames v. Exec. Airlines, Inc.*, 258 F.3d 7, 12 (1st Cir. 2001)) (emphasis added). A state-law claim is not preempted by the LMRA "if it requires no more than 'bare' consultation of a CBA," and if there is no "dispute as to 'the meaning of any *contract terms*.'" *Rose v. RTN Fed. Credit Union*, 1 F.4th 56, 61 (1st Cir. 2021) (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994)) (emphasis added); *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 18 (1st Cir. 2018) ("[S]tate-law claims that require "only consultation with the CBA," as opposed to "actual interpretation" of the CBA, "should not be extinguished.") (quoting *Adames*, 258 F.3d at 12). Put simply, as in the instant case, a dispute between parties to a CBA cannot implicate Congress' desire for uniformity in labor law when the dispute requires no actual interpretation or analysis of any terms contained *in the CBA*.

II.   **Analysis**

    **A. Resolving this dispute requires no interpretation of any term or provision of the CBA.**

The University asserts that "there is no way to answer this question" of whether the Class elected to be paid monthly without looking to the provisions found under the "Payday" article in the CBA. Mot. at 5. In fact, the provisions upon which the University relies demonstrate that the exact opposite is true. First, there is the question of when covered employees would be paid: as the University itself explains, the Payday provisions state that covered employees should be paid "in accordance with the University's normal business operations," on the "same day set for others in the University who are similarly situated." Mot. at 5 (quoting CBA at 23). That language plainly and unambiguously leaves the question of when covered employees were to be paid up to University practice. The University doesn't suggest any possible alternative reading. And no interpretation of the CBA is required to discern that. *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1040 (9th Cir. 2016) ("CBA interpretation" not required because even though the

6

CBA specified the "obligation to deduct funds from [] paychecks; the amount and frequency of the deductions" and other matters, the CBA "unambiguously" stated those matters).

What the Payday provisions plainly do *not* say are what the University's "normal business operations" entailed, or whether the University's normal way of doing things meant weekly pay, bi-weekly pay, monthly pay, or any other arrangement. The answer to those questions *cannot* be found in the CBA. Figuring out what the University's normal business operations entailed necessarily would require examining the University's *normal business operations*, and that would have to be proved by evidence necessarily external to the CBA (e.g., payroll calendars or policies, etc.). The simple fact is that the Payday provisions do not even arguably shed any light on the frequency or timing of pay for covered employees. The CBA would provide as much clarity if under the Payday article it simply stated: "Not covered by this CBA." And the University points to no other provision in the CBA that it claims provides more clarity; therefore, it has not identified a potential dispute about the meaning of any terms in the CBA, much less one that Plaintiff's claim "substantially" depends on. *See Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994) (". . . when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." (citation omitted)).

Similarly, the University does not even attempt to explain what in the Payday provisions, or any other provision of the CBA, might be interpreted to discern whether Plaintiff and Class Members waived their statutory rights and elected to be paid monthly. Confined to the four corners of the CBA, one would have no idea even of when or how often the University, in accordance with its "normal business operations," was paying its employees. How, then, could the CBA possibly be read to say that Plaintiff and Class Members waived the right to be paid in accordance with the

law? The University demonstrates through its own briefing the reality that there is no provision in the CBA purporting to "elect monthly pay": in the section of its brief discussing whether the Union "could elect monthly pay on her behalf," *see* Mot. at 7-8, it does not identify a single provision in the CBA that it claims represents a waiver. (If it intended to say that the two Payday provisions represent the Union's "election" that its members be paid in violation of state law then still, it fails to explain how those any *terms of the provisions* might be interpreted to say as much.)

The cases upon which the University relies, Mot. at 5, do not help its preemption arguments. The courts in *Cavallaro* and *White* (both wage cases) both found preemption, but neither court elaborated on *what* language it was in the relevant CBAs that triggered preemption. *See Cavallaro v. UMass Mem'l Healthcare, Inc.*, 678 F.3d 1, 8 (1st Cir. 2012) (finding that "whether there are wages owed thus will require construing and applying the various 'peculiarities of industry-specific wage and benefit structures' embodied in the CBA," without articulating the particular provisions); *White v. C. Carney Recycling Sols., LLC*, 548 F. Supp. 3d 272, 274 (D. Mass. 2021) (finding, "[e]ach of plaintiffs' claims . . . require for their resolution analysis and interpretation of the CBA" without articulating the particular provisions). Accordingly, those cases, at most, stand for the basic proposition that claims are preempted where interpretation of a CBA is required. As explained above, that is not the case here. The court in *Rose* did reference a provision from the CBA, but in that case, the pertinent CBA provisions had to be analyzed because it was *actually possible* that they might "shed needed light" on issues related to the plaintiff's claim. *See* 1 F.4th at 62. As explained above, that is not the case here.

In sum, the University has identified no term or provision of the CBA that requires analysis or interpretation in order to resolve Plaintiff's claim. Indeed, notably, the University has not suggested any alternative or competing potential meanings of the "Payday" article. Much less is

this a case where Plaintiff's claim depends "substantially" "upon analysis of the terms" of the CBA. Although the University contends otherwise, at most a quick consultation of the CBA is needed, just enough to see that the CBA plainly tells the reader to look elsewhere—at the University's normal operations (i.e., at evidence outside the CBA). As a corollary, no federal labor law can aid in answering what the University's regular pay days were and the answer to that question can have no implications for the uniform application of labor law. Accordingly, the LMRA simply does not mandate preemption of Plaintiff's claim. *E.g.*, *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 328 (1st Cir. 2016) (declining to find claim preempted when liability pursuant to a state law existed "entirely independent of any CBA terms"); *see id.* ("'no reason to hold [a] state-law claim defeated by § 301' . . . even if the need [arises] to 'look to' the CBA" to do things like calculate an employee's hourly rate for the purpose of calculating damages) (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 125 (1994) (Supreme Court precedent "makes plain . . . that when liability is governed by independent state law, the mere need to 'look to' the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301")).

### B. Plaintiff was not required to exhaust the CBA's grievance and arbitration procedures.

The University argues that, alternatively, Plaintiff's complaint cannot be read to assert a § 301 claim because Plaintiff has not exhausted the CBA's grievance and arbitration procedures. Mot. at 6-7. The University is plainly wrong here.

The University points to Article 7 of the CBA, which states that a "grievance within the meaning of [the CBA] shall be any dispute concerning the interpretation, application, or claimed violation *of a specific term or provision of this agreement*." *Id.* (quoting CBA at 8) (emphasis added). Liability in this matter turns on state law, entirely independent of anything in the CBA.

And it is clear that this dispute does not concern the interpretation, nor a claimed violation, of any term or provision of the agreement. The dispute concerns statutory rights that are independent of the CBA, and the CBA did not snuff out those rights merely by referencing the fact that covered employees would be paid in some manner. It is "inconsistent with congressional intent under [§ 301] to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract," *Allis-Chalmers*, 471 U.S. at 212, and it would be inconsistent for Plaintiff to have to exhaust grievance procedures outlined in the CBA when she is pursuing statutory rights that are independent of the CBA and do not concern the interpretation, application, or a claimed violation of it. Resort to the grievance procedure in the CBA is plainly not mandated here.

### C.  Plaintiff was not covered by the CBA during the Class Period.

Even if the CBA required LMRA preemption or resort to grievance procedures, Plaintiff's claim would not be extinguished because she was not a member of the bargaining unit. As provided above, Article 1 of the CBA states that the Union is the bargaining representative of a series of University employees, but "excluding . . . [the] director of the Health Communications Program" and separately excluding "all faculty who teach exclusively in on-line programs." CBA at 3. During the Class Period, Plaintiff was the Director for the Health Communications Program, with faculty title "Lecturer." Curtin-Wilding Decl. ¶ 2. The Health Communications Program was then and is still an online program. *Id.* ¶ 4. Accordingly, although the CBA purports to state how CBA-covered employees would be paid—like other employees, "in accordance with the University's normal business operations"—the Union was not, as the University contends, able to elect "a monthly pay frequency on [Plaintiff's] behalf." Mot. at 7.[2]

---

[2] Although Plaintiff and some Class Members were not covered by the CBA while some Class Members were, the same questions of law and fact are common to all Class Members: the CBA plainly says that one has to look to University employees in general to figure out how often

**CONCLUSION**

The University fails to point to any provision or term or language *in the CBA* that requires interpretation or analysis. The very terms it relies on—which require no interpretation and certainly do not "substantially" impact Plaintiff's claim—demonstrate that neither the question of when the Class was to be paid, nor whether Class Members elected monthly pay, can be answered by reference to the CBA. Accordingly, the LMRA does not preempt Plaintiff's claim. And it is not necessary or appropriate for Plaintiff, or any other Class Member, to have to resort to grievance procedures in the CBA when the rights that Plaintiff seeks to vindicate on behalf of the Class exist entirely independent of the CBA. And, Plaintiff is not a member of the bargaining unit and not covered by the CBA. The Court should deny the University's motion.

Dated: May 7, 2025                                      Respectfully submitted,

                                                        */s/Julian Hammond*
                                                        Julian Hammond
                                                        Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing document was electronically filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

  /s/ Ari Cherniak
Ari Cherniak
Attorney for Plaintiff

---

employees were paid, and it makes no distinction between CBA-covered and non-CBA-covered employees; and, even on the most favorable reading of the University's motion, it argues that one has to look to the University's normal business operations to determine if CBA-covered Class Members elected to be paid monthly, and thus that question will turn on nothing in the CBA and it will be answered the same for all Class Members.